Mr. Hoffman, before you begin, I wonder, do you concede that slavery violates an international norm that is specific, universal, and obligatory? Yes. All right. Not only that, I think aiding and abetting child slavery violates a specific universal and obligatory norm. Thank you. And that makes it even better. And let me just finish the question by saying the international norm you concede is there. Yes. Slavery is bad. The international norm defines what is bad. The question is, the mechanics for applying that standard, don't they then, don't we turn to the country that we're talking about? Well, I think that if, yes, generally speaking... The United States of America. Yes. And, in fact, that was the position of the United States government in both Keogh and in Jessner with respect to corporate liability. I think this court has decided that there is corporate liability for child slavery in Nestle I. And there's nothing in the recent decision in Jessner that changes that. Well, there is, of course, as to foreign corporations, right? Well, right. The foreign corporations in this case need to be dismissed, as we've said in our supplemental briefing. Okay. So what's the test now? The test for... If you could just walk me through the decision tree that you think we ought to follow in light of the most recent case law. We know what our court did in Doe 1. We've had a couple more cases from the Supreme Court. Do you think they have changed the decision tree? Well, if the question is about whether the presumption against extraterritoriality is displaced, is that the... The question is, what do you think the first part of the test is? Do you think there's a second step? What do you think the decision tree is, sir? Well, our understanding of it is that Keovil decided what the test was with respect to the displacement of the presumption of extraterritoriality. And that this court's decision in Nestle I, that the focus test was not obligatory in the context of claims under the Alien Tort Statute, is still good law. Okay. So let me try it this way. And RGR did not change that. You think that... Okay, that was... Maybe I jumped in too soon. Your position is that the more recent cases from the United States Supreme Court don't change anything since Doe 1? Don't require us to change our test? Right. RGR was a decision, obviously, about RICO, about a regulatory statute. Keovil set what the standard was for displacing the presumption against extraterritoriality. And, in fact, in Justice Kennedy's plurality decision in Jessner, there's no reference whatsoever to RGR. And there is a reference to the touch and concern test. All of the circuit courts have understood that the touch and concern test is the test that should be applied. Now, having said that, there's a dispute in the circuits over what the touch and concern test means. The Second Circuit and the Fifth Circuit believe that the focus test does apply and that Morrison would apply, and therefore, presumably, RGR would mandate that. The Fourth Circuit and Al-Shamari, the Eleventh Circuit and Doe v. Drummond, and I would argue Mojica, to some degree, and the Ninth Circuit, take the position that there are more factors that are relevant to that decision. And our position, though, is that we satisfy even the most stringent test, in the sense that we allege aiding and abetting activity on U.S. territory that satisfies even the most stringent focus test, which would be the Second or Fifth Circuit, which would say that as long as there's conduct on U.S. territory that constitutes aiding and abetting a violation of international human rights law that's specific, universal, and obligatory, the presumption against extraterritoriality is displaced, or it doesn't apply because the case is territorial. The district court didn't think so. The district court thought that your allegations really alleged general corporate activities for pretty much kind of vanilla corporate activity. So can you tell me what are your strongest allegations in the complaint that support your aiding and abetting contention? Your Honor, I think that, yes, the gist of our claim is, first of all, not necessarily when this Court found that the allegations satisfied that the defendants acted with a purpose to perpetuate child slave labor on the farms that they work with. I'm familiar with that claim. Our position on Actus Reis, which is the other part of it, is that they made decisions. They decided here to enter into exclusive buyer-seller agreements, which held these farms, which used child slaves to them to guarantee the lowest prices, which had to be based on child slave labor. And then they bound those farms to them by giving them financial assistance, technical assistance. In other words, they were part of this system. And to go to the Actus Reis part, which overlaps this, the Actus Reis in international human rights and international criminal law is practical assistance or encouragement or moral support that has a substantial effect on the perpetuation of the underlying crime. Our position is that they gave assistance, encouragement, and moral support to these farms that engage in endemic child slave labor, child slavery, and that they did that from the United States. And that is acting and aiding and abetting. It's also a conclusion. Can you tell me specifically the allegations you're relying on that are more specific about the conduct that is domestic? Well, the decisions resulting in all they did in COCO in Paragraph 59 with respect to cargo was done in the United States. The exclusive buyer and supplier relationships were decided. All of the major decisions in Paragraphs 36, 38, for Nestle 39, we have throughout the complaint alleged that everything was done with respect to bringing in COCO beans through these farms to the United States from Nestle USA headquarters here and cargo headquarters in Minneapolis. And if you look at Doe versus Exxon, for example, as a good example, Doe versus Exxon in the post-Kiovo world, Exxon made all the decisions to hire the Indonesian military and use it on Aceh from the United States. Nothing else happened in the United States. It was all decision-making control. And, in fact, in this case, there's an even greater factual context for control because of their dominance of the market. They dominate the market in Ivory Coast. They dominate the chocolate market here. They're huge in the market. They could, if they wished, end child slavery if they want, but instead they made the decision, as this Court found in Nestle 1, to purposefully continue a system of child slavery. That satisfies aiding and abetting for the Actus Reis under international law. But, counsel, here's what would be helpful to me, because you know opposing counsel is going to come to the podium and say that's not our purpose. Our purpose is to secure our commodity that we need, right? That is our purpose. So what is your response? Well, I think that it's not my response. I think it's the response that Nestle 1 gave, which is that the pursuit of that kind of profit, the ability to profit, purposefully continuing relationships and giving assistance to farms that engage in that kind of behavior is purposefully. . . As opposed to knowingly. As opposed to knowingly. Right. And I think this Court in Nestle 1 didn't decide between knowledge and purpose. Right. And so, but it found that our allegations satisfied purpose, so it didn't have to decide that. And so, and with respect to Actus Reis, and you mentioned the District Court's opinion, I think what happened, the more I've thought about it, is that the District Court misread what this Court said in Mojica. In Mojica, this Court said U.S. citizenship is not enough. From that, the District Court extrapolated, if all that any U.S. corporation does is the kind of thing that U.S. corporations do anyway, that can't, as a matter of law, be Actus Reis. That's not what Mojica said. In fact, the facts in Mojica was that there was nothing that happened in the United States. Occidental Petroleum didn't make any decisions from Los Angeles. The decisions in the, it was a one-off event, the bombing of a village. All the planning was done in Colombia in Occidental's headquarters. In this case, we're talking about ongoing relationships that have gone on for decades with these farms. This is an ongoing relationship where they secure the cocoa beans at the price they need, and that is on the backs of child slaves. Do they bring the product here?  Yes, I think that's clear. All of it? What you say repeatedly is that the farmers are in exclusive relationships. I want to make sure I understand truly. Right. The farmers are in exclusive relationships, so they're buying all of the crop from a particular farm. Right. So you certainly allege that those farms are entirely dependent upon these defendants. Right. I don't know if that's true of the domestic defendants as opposed to the foreign defendants. As you conceded, those have to be parsed. Well, it's easier for cargo. Sorry. That's all right. But I can't tell from your complaint the extent to which the defendants are dependent upon this source for their supply. Am I missing that allegation? Our understanding is that they are dependent on this for the low-priced cocoa that they get for the U.S. market. That's the gist of our allegations. Do you allege that in addition to buying the crop, that these for-profit corporations also, I think you said provide spending money? They do. I don't want to mis-paraphrase, but I think that's the gist of it. Is that right? Well, there's spending money. There's also additional resources, money, technical assistance, training. In other words, they work hand in glove with these. Sorry. It seems to be very qualitatively different for a for-profit corporation that needs to secure a commodity to supply its production, to be concerned and supplying technical support to make sure that those supply lines are secured, and quite different for a for-profit corporation to give away money that's not in advance for payment of the crop. And I think you're alleging the latter, but I want to be absolutely sure about that. Well, both. I think we're alleging both. Do you know the paragraph in your complaint where you allege the latter? The latter being? Giving money? You said spending money to farmers. If I could give you that, but when I get back. You can give it when you come back. I just want to make absolutely sure that we're clear about your allegations. But I think the point of Actus Reis and international law, at least, is that it's not just each of these individually. It's the entire package of financial assistance and whether it has a substantial effect on the child slavery system. And that allegation would satisfy international law and would also satisfy even the narrowest test for touch and concern. And I would just argue that we believe this Court should adopt the broader, multi-factor test with respect to touch and concern because that is more consistent with the history and purpose of the Alien Tort Statute. Hang on one second. I'm sure you want to reserve some time, and I wanted to make sure my colleagues have an opportunity. Well, I'll defer to Judge Nelson since she wrote Nestle 1. Well, we've got several questions. I suspect you're going to be up here a bit longer than your time. Go right ahead, Judge. Is it true that they also visited regularly to make sure that the people supervising the slaves and so forth were doing their job? Yes. And that's the allegation is that they sent people to visit, that they know what's going on, and that they work hand-in-glove with these farms that engage child slaves. So it's an ongoing system that depends on decision-making at the highest level in the United States and decisions that send technical assistance, money, people, everything that you could think of that would make them a participant as an aider and a better in this system. In all candor, it's hard for me to understand or to parse out from the existing complaint which defendant you think did what. Would you concede that if the case is remanded, we would need not only to have the foreign corporate entities removed, but we'd also need to know exactly which defendants. You've pled them. There's plural references to defendants throughout. Well, we would certainly have no problem amending our complaint to parse that out. In fact, we'd have to parse out the foreign. It's not a small matter, at least speaking for myself on my scorecard, and I struggle with it, so I wanted to make sure I gave you that feedback. Obviously, we'd have to do that. When you read Ziegler and Jenner, do they give us some direction as to where the court's going, SCOTUS is going? Don't they really say, we're going to wait for Congress? Well, I think in the case of Ziegler, it's only the most recent pronouncement that members of the court don't like the Bivens line of cases very much. Well, it was the philosophy that was expressed by both Kennedy and Thomas in that case where they talked about a time when the court felt it needed to create a remedy, and since Congress really hasn't spoken here on whether or not they were going to extend the liability to a domestic corporation, don't you really think that they're giving us a signal, and does that matter? I mean, we're still the Ninth Circuit, or my colleagues still are, and we've been known as sitting in the Ninth Circuit to have our own view of things. Well, I have two points in response to that. One is that the court took cert twice now to decide the question of corporate liability generally and hasn't, which suggests that they haven't made up their mind with respect to the more general question of corporate liability, and they acted for specific reasons with respect to foreign corporations that had, I think, a lot to do with things like the protest that the United Kingdom and the Netherlands made in the Kiobel case about the assertion of the ATS against their corporations, and South Africa did that in footnote 21, and Sosa even as far back as that. The court was concerned about foreign protests with respect to the assertion of ATS claims against foreign corporations. Those factors don't apply to U.S. corporations, and in fact, most of those protests said, you have every right to regulate your own corporations with respect to the ATS, but you shouldn't be able to regulate ours. The way I hear it, the way I read those is that the SCOTUS basically said, we're not going to act, but if Congress, we're not going to find that, but if Congress wants to do it, then let Congress do it, and that seems to be the way that they're shifting. Well, but I think, obviously, I can't prognosticate how the court will ultimately decide these questions, but there's a significant difference between Bivens and the ATS. In the ATS, Congress did act, and in Sosa, they explained why they acted, and they explained the context in which they acted. In other words, Congress authorized the courts to do this. This wasn't the Supreme Court in 1971 deciding in Bivens that it needed to act to implement the Fourth Amendment in the absence of congressional action. Congress acted. Congress has already acted on slavery, creating laws against it here, and giving civil causes of action for people who benefit from slavery, don't they? Well, there are some acts, including the Trafficking Victim Protection Act that deals with some of that stuff. Well, 18 United States Code, Section 1595. That's right. That's the Trafficking Victim Protection Act. Okay. So you have that as an act, and does that inform our question about what Congress thinks about all this? You know, I think that what it shows is that Congress, that there's a broad consensus in Congress to act against forced labor and slavery in the world. I don't think that what that means is that this case is in any way preempted by that. I don't think there's anything in that act that says that other acts are preempted. I'm unaware of anything in any of the provisions of the Trafficking Victim Protection Act that say this is the exclusive remedy, or even in the legislative history, that it's the exclusive remedy for this kind of problem. Well, ATS doesn't say that, but those acts do say it, and that's why I found them interesting. Well, I mean, the ATS obviously doesn't say anything. It was the first statute that Congress passed in 1789. And so SOSA, I think, lays out the history as well as anyone will ever lay it out in terms of why it was passed and the reasons for it. And I think that in this case, it fits the history and purpose in the sense that you have aliens that are seeking against U.S. corporations that have violated international law from here. I've got a couple other questions. So in the United States, often agriculture is on the basis of producing a crop by the farmers, and then you give it to a broker who brokers the crop, and other people buy it to grocery stores, department stores, whatever. So it's the direct involvement that you see in this case that you've alleged, that they were directly involved, and I think there's been some questions about that. But if there was an intermediary, a broker, where they simply bought all the cocoa from a broker and they didn't have that direct involvement, even though they supplied money to the broker, then? I think that would be a very different case from our case. Okay. And if pirates, for example, were successful in interceding and capturing the ships that brought the cocoa, so to speak, and they bought the crop from the pirates who were real successful. So we're going back to the original reason for the rule, which is piracy, which is in part what occurred at the time. It's also extraterritorial, which also suggests that the focus test probably is a narrow focus test that only applies to territory is not going to meet the history and purpose of the ATS, because one of the things that everybody agrees on is that piracy was covered, and piracy is not territorial. Now, the Supreme Court didn't really deal with that problem in Keogh because it didn't have to. But one of the reasons that the touch and concern test, I believe, has to be broader than the Second Circuit and Fifth Circuit have found it is that Congress was concerned about situations in which U.S. actors, be they governmental or private, might engage in acts that would create problems for the United States, either because of the U.S. citizenship of that person or because of where the acts took place. And I think that's why the touch and concern test cannot be did something only happen on the U.S. territory, because there's a broader concern. And I think that this Court in Mojica sort of hinted at that. It didn't have to decide it. And you have that split in the circuits between the Fourth and the Eleventh and the Second and Fifth. Thank you. Anything further? Thank you, counsel. We'll hear from opposing counsel. Good morning, Your Honors. Good morning. And I want to do for you what I did to opposing counsel. Do you concede that slavery violates an international norm that is specific, universal, and obligatory? Yes, Your Honor. All right. So we start from that perspective. Madam, that really is the beginning point. I represent Nestle in the USA. Mr. Pincus is going to argue for Cargill. And, Your Honor, Judge Nelson, let me say Nestle opposes slavery, child labor vehemently, and it's alleged in the complaint, if you look at paragraphs 53 to 57, its policies are against slavery. We all think it's abhorrent, of course. But the question here is whether this Court should recognize a federal common law cause of action under the Alien Tort Statute, which the Supreme Court has said should be interpreted narrowly, cautiously, modestly, for a variety of reasons that I'll come back to. But here the question is whether to hold a candy company, Nestle USA and Cargill, a supplier of cocoa to Nestle, responsible for crimes perpetrated in West Africa by unidentified, unknown foreign criminals and perpetrated against unnamed foreign plaintiffs. And the question is, can that be done? And the answer is no. And I was going to touch on three main reasons during my time. First, it's an improper extraterritorial application of the Alien Tort Statute. Second, the plaintiffs here lack standing to bring this action against Nestle USA. Mr. Hoffman talked a lot about the general social problem, the human rights problem, but nothing in the complaint, nothing says that Nestle USA had any connection to the plaintiffs in this case. If you just look at paragraph 70 of the complaint, that's where they repeat the same allegation for all six plaintiffs. The closest they come to tying these plaintiffs to any defendant is the following allegation. Upon information and belief, the cocoa cultivated on this plantation is supplied to anyone and any more of the defendants herein. It doesn't say when. It doesn't say that that happened while these individuals were in captivity under their allegations. It doesn't say it is supplied, which suggests now, and it doesn't say which defendant. And Nestle USA is based in the United States. It's a candy company. It doesn't have exclusive supplier contracts. And there's only three allegations in the complaint against Nestle USA, paragraphs 1, 20, and 35. And the third point I'm going to come back to is what Judge Shea was asking about the Jesner decision. Counsel is reading from a different history book regarding the Alien Tort Statute. We all agree human rights abuses are terrible, but the purpose and effect and intent of Congress is laid out in Sosa, Kiobel, and Jesner, and it's the opposite of what counsel is saying. It's a narrow statute that had three very specific purposes, safe conducts, ambassadors from foreign countries who were in the United States, and piracy on the high seas where no other jurisdictions, no one has jurisdictions. So your argument is the ATS is limited to those three circumstances? Well, I think just, we're not making that argument here, and in fact Sosa went beyond that. Right. But Sosa and Jesner say, there's an argument at least, Justice Kennedy makes this point, that this is probably as far as it goes. But the court doesn't have to reach those issues. There's a drumbeat to be very, very cautious. Very cautious, in part because of domestic strife. The purpose of the statute, the ATS, was to avoid domestic strife. So the United States could give a remedy to aliens here, ambassadors and the like, when they were injured so as not to cause a war with another country. Right, and so he's conceded that the foreign corporation entities have to be stripped out so that he's talking now about domestic defendants, right? Yes. Which I think answers, or at least goes to the point that you're making now, and he's arguing domestic conduct as well. Let me turn to that because, and you started out, Your Honor, with questions about the test. It's absolutely clear that the test is stated in RJR, and I think the plaintiffs are fighting so hard because they can't meet that test. And literally, RJR says, and this is page, well, I'll find you the page, but the court says, Morrison and Kiobel reflect a two-step framework for analyzing extraterritoriality. Could not be clearer. That's the Supreme Court from 2016. But why did they fail the test? Let me tell you. So the first part of the test is, does the Alien Tort Statute apply extraterritorially? We know the answer to that is no from Kiobel. The court explicitly said there's no indication Congress intended that, and the presumption against extraterritoriality has not been displaced. So, right, but they don't fail that because their allegation is, now we're only alleging domestic conduct, right? Exactly. So that takes us to Part 2 of the test. Right. Part 2 of the test says, what's the focus of the statute that we're talking about, here the Alien Tort Statute, and does the conduct that's relevant to the focus, does it occur in the United States or does it occur in a foreign country? Here, the conduct that is the focus of the Alien Tort Statute is the tort, the injury inflicted on the plaintiff. Why do you, your briefing makes that point repeatedly, that we have to look to the place of the injury to figure out where the tort occurred, and if the tort is aiding and abetting, I take issue with, what's your strongest authority for that? Well, I think just the general restatement of torts and the notions of torts, but the court, again, doesn't have to go all that way. Okay, because I find that not persuasive, so I want to make sure I get the benefit of your response. I think the test is, what is the focus of the statute? It's not just the injury that occurred there, it's the kidnapping, the trafficking, and the forced labor on the farm. And forgive me for interrupting, but his argument is it's the aiding and abetting, so I want to make sure I understand your client's position. Is it your position that aiding and abetting doesn't suffice? They would have to actually be engaging in those atrocities? Well, I think, Your Honor, that there is a strong argument under Jesner and the Supreme Court's analysis that aiding and abetting is not a viable theory under the appeal in court statute. Has any court said that? No courts have said that. The courts have, and this court has already, so I'm not fighting that issue for now, but I want to preserve it. Okay, so I couldn't find where any court said that either, but I do want to make sure that I understand your client's position.  I'm preserving it, but today I'm not making that argument. Okay, all right. So back to step two, if you would. Back to step two. Okay. So the focus here, let's talk about what happened in the United States. This court, Judge Nelson, you noted that in the complaint before the court, the first go-around, they had not alleged any U.S. conduct or identified which conduct happened in the United States, so that you gave them a chance to amend on remand. What did they do? Their main allegations, in detail, were to allege that Nestle and Cargo have these policies against child labor, against slavery. That's the main addition, and that those policies were disseminated in the United States. I know no court has ever held that aiding and abetting, to have a policy against the wrongful conduct. The other thing they argued, I mentioned the paragraphs that Nestle USA is based in the United States, which it is, it's a candy company here. It made decisions in the United States, true, and Your Honors asked counsel to point to their best paragraph, regarding the parties. Counsel, I think, misstated it. The paragraph about Nestle, I think, is paragraph 37 and 38, and they lump everybody together, as Judge Christin, you noted, which you can't do. Those foreign companies were dismissed from the case by the district judge in the first go-around, and the appeal was abandoned. I don't know how they could amend the complaint to leave them in there. It's completely improper. But the point is, there's no allegation of any connection or any purpose or any direction to engage in child labor or anything like that. Here, for me, is the most difficult part of the case. The district court thought that the conduct the plaintiffs pointed to was basically conduct that corporations engage in. And I'll just paraphrase it that way because, of course, you know the position. But among other allegations, they're not just arguing that the defendants purchased the crop. They're not just arguing that the defendants provided all kinds of aid to make sure the crop was successful and that they had what they needed to make their chocolate. They're also arguing that, among other actions, the defendants gave spending money to farmers. These are for-profit corporations, of course, and that seems to be just giving away money, giving away subsidies, as opposed to making advance payments for the purchase of a commodity. It does not strike me to be consistent with running a for-profit corporation. We don't really know what they mean by that. Well, but it's an allegation in the complaint. Yes. They say it. It's completely conclusory. There's no allegation that Nestle USA gave spending money to anyone. Nestle USA buys cocoa from cargo. This goes to Judge Shea's point. It's not their Nestle USA. There's no allegation in the complaint that this U.S. company is there dealing with the farmers, let alone these farmers. Well, and I've signaled that I have a problem with the plural. Yes. In figuring who did what. So I've signaled that. But what is the best response? And maybe I'll hear from your co-counsel as to that allegation. Are you saying that it's conclusory as in it doesn't pass the Twombly test? That and, Your Honor, it wouldn't change the equation here. Why not? For several reasons. First, it's not an allegation that specifically says, it doesn't say it was spending money in order to engage in bad labor practices. Paragraph 37, the only mention of labor practices is that defendants give training for appropriate labor practices. So the complaint on its face, if one reads it from start to finish, doesn't hang together. It doesn't tie Nestle USA to the farms, to the individual plaintiffs, to the time frame. And I think Judge Wilson got it exactly right. The U.S. activities are U.S. decisions, U.S. presence, U.S. publications against child trafficking and child labor, and it's completely conclusory. And I don't want to eat up all my colleagues' time. I have a question for you in that regard. Wasn't there allegations that they visited the farms, gave instruction, showed them how to grow, those sorts of things? There are those generic amalgamated allegations. But, one, there's nothing specific as to Nestle USA. And that is not enough, Your Honor. They don't say that they engaged in practices and training about how to engage in child labor. It's the opposite. They gave training about how to engage in proper labor practices. It's completely speculative to just announce. And it's really not fair to companies to say, oh, of course they knew when they were there on the ground. There's no facts in the complaint that they saw child labor, and the policies are against that. So it's speculative and conclusory. And, again, I go back to where I started. We oppose child labor. The companies have strong policies against it. There's no facts in the complaints that allege otherwise. It's complete conclusions and speculation, and there's no basis for those sorts of allegations. Well, let me ask about the allegation that you opposed a statute that would prohibit child labor goods from coming in. 2001, Your Honor. Yes. The statute, first of all, I think this is telling. Plaintiffs have misstated what the statute was. It was a statute that would have given a $250,000 appropriation to the FDA to study the possibility of a voluntary labeling system that would have labeled companies could have labeled their products slave free. That was in 2001, the same year the last plaintiff, thankfully, apparently was able to leave their captivity. So there's no connection in terms of what it would have done, totally speculative, no causal chain from a standing perspective. There's no causal link between those individual plaintiffs and that statute. But what came in after that, Your Honor, was a voluntary agreement with the members of Congress input, this protocol that the companies would take action and try to help eliminate child labor. And maybe I'll finish with this so I don't eat up all of Mr. Pincus' time. He's going to have time. You'll give him his time. Okay, thank you. But I want to, on policy, and this is an important issue, I don't want to minimize it all. This is a human rights problem that the world has to deal with. But as Justice Kennedy noted in Jesner, and Judge Wilson noted here, one of the policy determinations that Congress and the executive branch can make on this foreign policy issue is that the best way to try to stamp out this kind of human rights abuse is to encourage economic investment by companies that have corporate social responsibility programs to eliminate it. And Justice Kennedy said the danger of this broad application of the ATS would be to deter companies from making those foreign investments. And it would be, and Judge Wilson noted, if having policies against the practice is going to implicate you in the practice, then companies will be concerned about having a social responsibility, a corporate responsibility program that would try to outlaw these practices. And that's a policy issue for Congress and the executive branch. It's an important one that everybody needs to seek to achieve. But the Alien Tort Statute is not the means for doing that. And with that, I will sit down. Thank you very much. Thank you. Could you put five minutes on the clock, please? Thank you for your argument, counsel. Thank you. Good morning. I think it's still morning. Yes, it's still morning. Thank you, Your Honor. May it please the Court, Andrew Pincus for Cargill. Like Nestle, I just want to make clear, Cargill abhors forced labor and is working to stop it. But federal common law does not create the remedy that plaintiffs seek. If they believe a private cause of action is the right way to address this issue, they have to seek that remedy from Congress. I want to start by answering Your Honor's question about the spending money. That allegation is in paragraph 37 of the complaint. And what that paragraph says is that the defendants provided, defendants without identifying them, provided farmers and or cooperatives with ongoing financial support, including advanced payments and personal spending money, to maintain the farmers and or the cooperatives' loyalty as exclusive suppliers. So it makes quite clear that the spending money and the training and the supplies are all part of the commercial arrangement to maintain the relationships with these farmers. It's not separate. And perhaps to maintain the relationship, and this is the problem I have with it, forgive me for interrupting, but perhaps to maintain it to the tune of not just buying the entirety of the farm, but to keep the price as low as possible. That perhaps, in other words, subsidizing an enterprise that otherwise would not be economically viable. Well, I don't think so. Because if they're giving money to that. Well, where does a for-profit corporation, where can you show me that that's consistent with a typical activity of for-profit corporation to give spending money to farmers overseas? Because from the corporation, this is all part of a commercial relationship. The company is on one side, the farmer is on the other. The deal is we'll give you certain things in return for your cocoa. The certain things. And typically you buy it at the market rate. Maybe there's other technical assistance, but I'm having a hard time with cash subsidies. Well, I don't think there's any difference between cash subsidies and giving fertilizer, for example. I think it's all about an additional commercial and economic inducement for the farmers to enter into it. But I think it is just part of a commercial arrangement. If you could say no personal spending money and you could say support to buy farming supplies, and it would be exactly the same thing. The fact that they've characterized this as personal spending money. It's very different than just buying a crop. It's very different in my assessment, and I really want to give you an opportunity, because for me this is the crux of it. It's really different than if a crop had been produced and they're just buying it at the market rate. But that's not the allegation in the complaint. The allegation in the complaint I think fairly read is that, and I'm not making a judgment about this. Of course, I have to take these allegations as true for our pleading rules at this early stage of litigation. And I appreciate that it's been going on for many years. Early. Well, it is. We're at the complaint in that sense. So forgive me. I'm not overlooking that it's dragged on for many years, certainly. But it seems to be very qualitatively different than other corporate activity. I'm sorry, Your Honor. If you read the rest of the paragraph, training, capacity building, and growing and fermentation, the idea here is to build relationships so that the quality of the cocoa that's being produced and to build a relationship that on the company side encourages the farmer to use good techniques so that the quality of the cocoa that's produced will be what the company needs. And that requires a long-term relationship, and that requires economic inducements to maintain that long-term relationship, which are all the things we talked about. I truly don't believe, Your Honor, that characterizing it as spending money as opposed to saying additional subsidies for purchasing fertilizer makes a difference in what's happening. But if I may ask. I could just ask about that. They're visiting every few months. Are you saying they had no idea there was child slavery there? Well, there's no allegations about what happened on the visits in the complaint. But if I could back up, Your Honor. I think one of the things to think about here is what is the text, the test that we're applying to determine the inquiry, which I think RJR and Kia Bell Direct, which is, is this application of the ATS domestic? Because if it's not domestic, then it's impermissible. And I think going beyond our position that the locus of the injury is determinative, certainly the locus of the injury is significant. And the aiding and abetting activity, much of it alleged was in West Africa, the paying of the money, the purchasing of the cocoa, all of the providing of the training. So what happened in the U.S. to counterbalance that? And the only thing in the complaint that even begins to counterbalance that is decisions being made in the U.S. about these particular programs. And I think if the court looks at the Drummond case, it's very instructive because it's a case in which the argument was conduct being directed from the U.S., conduct there to enter into a conspiracy. The allegation was officials in the U.S. entered into a conspiracy to engage in extrajudicial killings, directed that that happen, and supplied the equipment specifically for the extrajudicial killings. And the court in that case said that is not enough. These general allegations of control from the U.S. do not counterbalance the fact that all these other things relevant to the case occurred outside the U.S., and therefore we have to find that the claim there is extraterritorial. Contrast that with a case like Alshamiri in the Fourth Circuit, where the court said here we have people hired in the U.S. that were then sent to work under a U.S. government contract, their torture activities were supervised from the U.S., the cover-up was directed from the U.S., and the Fourth Circuit said that's enough. That's a very different case from the allegations here, and I think that's a very critical distinction. I want to also, my colleague addressed some of the aspects of the lobbying that Your Honor referenced, but I think the Norr-Pennington principle is very significant here. I think the courts have said in a variety of contexts that applying basing alleged wrongfulness on protected First Amendment conduct is impermissible, and that's exactly what would happen here if the court said the basis for finding this claim domestic is protected lobbying activity. Counsel, you're over your time, but don't go away. I want to make sure my colleagues have an opportunity to ask questions. Sure. I wanted to ask, to follow up the question, is the activity alleged in the complaint and whether or not it meets the test, and that is, is it your position that the allegations in the complaint are really insufficient because they don't say that the American companies made strategic decisions, funded those decisions by sending people clear instructions to do thus and so in order to ensure that they got their crop. So that's not enough in your mind? I think the allegations in the complaint are not, and again I would urge the Court to compare them to the allegations in Drummond, which that Court said were not enough, and the allegations there were just that, that from the U.S. the directions were to engage in extrajudicial killing. What courts have said uniformly in these cases is we need some wrongful conduct in the U.S., the Alshamiri case, the hiring of the individuals. The Exxon case, Exxon. Counsel, forgive me for interrupting, but I, before you finish, just right there. Are you taking the position for your client that aiding and abetting is not enough? You mean whether there is ATS liability? I'm sure you're not taking the position that child slavery doesn't violate an international norm. No. But the allegation here, of course, is that the domestic conduct was aiding and abetting. We've preserved that issue in light of Jesner. We're not asking the Court to decide it. I think if the Court were to reach the Actus Reis issue, and to find that under whatever applicable test the Court decided that these acts constituted sufficient Actus Reis, I think then the Court would have to address the question in light of Jesner of whether its prior decisions about aiding and abetting can stand in light of what the Supreme Court said in Jesner, because I think Jesner is relevant. As Your Honor said, it's not just about foreign corporate liability. It's about a mode of analysis for thinking about these questions, and I think it's very telling that not only did the Jesner Court recite the restrictions on Federal common law development that Your Honor referred to in areas like Bivens, but it said that these principles apply with special force here. It's a higher bar here because of the foreign policy issues involved. So I think that consideration. Ginsburg, what foreign policy issues are involved? Has any government objected? Has our government objected? Well, in the RJR case, Your Honor, what the Supreme Court said, because of course that was a case where the foreign governments were actually the plaintiffs and seeking an extraterritorial application of the statute, and the Supreme Court said the fact that the foreign governments want an extraterritorial application in this case is not dispositive. We look at U.S. law and decide what the right answer is, whether or not someone's complaining. Justice Kennedy in Jesner cited aiding and abetting claims as something that are particularly problematic because they allow claims against corporations to be used as a way to get at arguments about foreign individuals or foreign governments as in this case not doing the right thing, and that that threatens the very foreign policy tension that this statute is designed to prevent. Again, Jesner says there should be claims under the ATS when the claim is necessary because foreign governments would object to the U.S. not providing a remedy. There's no way that this case, where so much of it happens overseas and so little has happened here, that anyone could credibly say that a foreign government could object. And if I may... Counsel, hold on. Yeah. I just want to make sure Judge Nelson has a chance to get a question in. Well, the Supreme Court has not illuminated Step 2. In Nabisco, as Nabisco explained, Kiobel stopped after the first step because there was no relevant conduct in Kiobel. Therefore, there is no need to move on to the second step. Well, what do we have here? We have Adhikari, although there was a dissent, indicating what that might be. So are we bound by anything on that? Well, I think Adhikari, as Your Honor says, says that the RJR focus test applies. The cases that my colleague, Mr. Hoffman, referred to in the Eleventh and the Fourth Circuit are pre-RJR, so they don't really take into account whether RJR directed the application of a focus test. I think it's pretty clear, based on what RJR said, as the Adhikari court said, that the focus test is the right answer here. I don't think, in this case, the court has to go all the way of saying the focus is the place of injury, because I think, as I said, at the minimum, that test requires looking at where the locus, where is there sufficient weight to this claim in the acts alleged to have occurred in the United States to counterbalance the acts that occurred abroad. And I think if you look at Drummond, if you look at the cases that have rejected similar claims, those involve worse facts than these. And the cases that have adopted claims, like Al-Shamiri and the Exxon case, involve actual specific allegations that the specific wrongful conduct was directed in the U.S., and that does not exist here. Are there any other questions? No, thank you. No, thank you. Thank you, counsel. Thank you, Your Honor. Thank you, Your Honors. I wanted to start by focusing on the relationship between mens rea and actus rea, particularly in light of this Court's finding in Nestle 1 that the defendants acted with a purpose to perpetuate child slavery on the farms, which is really quite important. The Nuremberg principles, I think, the Nuremberg cases are very helpful on this. For example, the Zyklon B cases, the defendant that understood that the Zyklon B was being used to de-louse the usual use, the ordinary business use, was acquitted. The defendant that knew that the Zyklon B was being used to kill human beings was found guilty. Same actus reas, supplying an ordinary business thing to a government. One was a violation of international law because of the mens rea. The other one was not. The same thing with respect to giving money and financial assistance. The defendants cite the Ministries case where Rausch was acquitted for just giving money, but they don't cite the Flick case where Flick was convicted for giving money, and he was convicted for asking for more workers for his company, knowing that there would be forced labor used. Our allegations go far beyond that. Our allegations are first that they're engaged in a purposeful series of conduct, controlled from the United States, from their headquarters, to supply a cheap, continuous source of cocoa beans that are based on slave labor. So they are in bed with the slaveholders, and they give them money. They give them money for personal things. They give them money for advances. They give them technical assistance. Of course they want good cocoa beans, and they want them cheap, and that's what their purpose is. That is aiding and abetting under international law. There's nothing in Jessner that says that there's no aiding and abetting. Jessner didn't change SOSA. It didn't overrule it. SOSA has all the same words about caution and foreign relations in the whole analysis, and every circuit has found that aiding and abetting applies. And there's no principle that ordinary business practice is not actus reus. There's no principle in international law that says that the acts for actus reus have to be wrongful in themselves. There's nothing in international law that says they have to be a but-for cause for what happens. So we have alleged much more than that. I acknowledge, Judge Christin, that we would have to amend our complaint to make it more specific in a number of ways. I agree with that. But in terms of the core allegations in this case, we have alleged an international law violation that touches and concerns the U.S. territory substantially because of the control. And I think the Doe versus Exxon example is a more modern example of where that kind of control from the United States was found to satisfy the touch-and-concern test, which is the test that Kiobel used and which Justice Kennedy just cited in Justner a month ago as the test that applies to displace the presumption of the extraterritorial application. Unless the Court has questions, I'll stop. I think there's nothing further. Thank you all for your very helpful arguments. We're going to stand in recess for about five minutes.
judges: D.W. Nelson, Christen, Shea